## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| STATE OF MARYLAND,<br>    200 Saint Paul Place<br>    Baltimore, MD  21202<br><br>DISTRICT OF COLUMBIA,<br>    400 6th Street NW<br>    Washington, DC  20001<br><br>STATE OF NORTH CAROLINA,<br>    P.O. Box 629<br>    Raleigh, NC 27602<br><br>            Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION,<br>    400 Maryland Ave SW<br>    Washington, DC  20202<br><br>LINDA McMAHON, *in her official capacity as*<br>*United States Secretary of Education*,<br>    400 Maryland Ave SW<br>    Washington, DC  20202<br><br>            Defendants. | Civ. No. 1:25-cv-04298 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Since 2008, the U.S. Department of Education (ED or the Department) has provided grant awards to support Full-Service Community School (FSCS) programs.  As described by ED, FSCS grants "provide support for the planning, implementation, and operation of full-service community schools that improve the coordination, integration, accessibility, and effectiveness of services for children and families, particularly for children attending high-poverty schools,

including high-poverty rural schools." *See* U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)—About* (July 16, 2025), *available at* https://perma.cc/NT4M-AFPQ.

2.    FSCS projects focus critical resources on elementary and secondary schools that need them most, offering students and their families additional support to meet academic, health, and social challenges.

3.    As Congress has increased appropriations for the FSCS program over the past two decades, funding for FSCS has risen from $5 million for Fiscal Year (FY) 2008, to $150 million for FY 2025.  U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)—Funding and Legislation* (July 16, 2025), *available at* https://perma.cc/NT4M-AFPQ.

4.    ED has awarded FSCS funds to nonprofit organizations (such as United Way chapters), local school districts, and universities, all to support FSCS projects at elementary and secondary schools.

5.    Pursuant to governing regulations, ED first funds the initial one-year budget period for all FSCS grants and then funds subsequent years of the project through annual one-year continuation awards.  Grantees are not required to reapply for these continuation awards.  *See* 34 C.F.R. § 75.118; 59 Fed. Reg. 30,258 (June 10, 1994) (eliminating application requirement for continuation awards).  Rather, ED makes continuation awards based on grantees' performance. Because ED raises any concerns about grantees' performance "well in advance," it generally "do[es] not deny a large number of non-competing continuation awards."  *See* 89 Fed. Reg. 70,300, 70,316 (Aug. 29, 2024); *see also* 59 Fed. Reg. at 30,259 (explaining that a total cut-off in continuation award funding is "extremely rare in practice").

6.    To decide whether a grantee met the requirements, listed in 34 C.F.R. § 75.253(a), to receive a continuation award, the Department considers a grantee's performance measures,

performance reports, and financial data. *See id.* § 75.253(b) (identifying "any relevant information regarding grantee performance" as the sole "[i]nformation considered" when "determining whether the grantee has met the requirements described in paragraph (a)"); 59 Fed. Reg. at 30,259 ("[T]he continuation award decision . . . will be based entirely on the submission of [performance] reports . . . rather than on the submission of a continuation award application."); *see also* U.S. Dep't of Educ., *Discretionary Grantmaking at ED* 31–32 (2024), *available at* https://perma.cc/X9V8-TEAC (*Discretionary Grantmaking*) (describing the performance information used by the Department for continuation award decisions). For grantees that meet the requirements in 34 C.F.R. § 75.253(a), the Department prioritizes continuing multi-year grants over funding new grants. *See id.* § 75.253(c); *Discretionary Grantmaking* at 45 ("A grantee does not have to compete with other applicants to receive [a continuation award].").

7. For FY 2022, the University of Maryland, Baltimore (UMB), was awarded a FSCS grant of approximately $1.9 million, with an anticipated duration of five years, from 2023 to 2027. *See generally* U.S. Dep't of Educ., *Full-Service Community Schools Program (FSCS)—FSCS Grant Awards* (July 16, 2025), *available at* https://perma.cc/NT4M-AFPQ.

8. For FYs 2022 and 2023, District of Columbia Public Schools (DCPS) was awarded five-year FSCS grants totaling nearly $5 million to serve projects in public schools.

9. For FY 2023, the North Carolina Community Schools Coalition was awarded a nearly $50 million five-year FSCS grant to serve public schools throughout North Carolina.

10. Plaintiffs' FSCS projects have provided critical support to students and families. By way of example, UMB's project has led to increased attendance at two Baltimore high schools and facilitated significant direct financial support for students in need, such as housing assistance

and utility support.  In consequence, Plaintiffs' FSCS projects received continuation awards in both 2023 and 2024.

11.    Despite these successes, on or about December 12, 2025, the Department and Secretary of Education Linda McMahon (together, Defendants), decided to discontinue Plaintiffs' FSCS grants based on a purported conflict with the current administration's "priorities."

12.    ED sent Notices of Non-Continuation of Grant Award to FSCS grantees stating that their grants would be discontinued effective at the end of the current budget period, December 31, 2025, just over two weeks after the letter was sent.  By way of example, a true and correct copy of the Notice of Non-Continuation of Grant Award sent to UMB is attached as Exhibit 1.

13.    At least one grantee in each of Plaintiff States received a similar Notice of Non-Continuation from the Department.

14.    According to public reporting, ED cancelled a total of $168 million in FSCS grants across the country for similar reasons.  Mark Lieberman, *"A Gut Punch": What Trump's New $168 Million Cut Means for Community Schools*, Education Week (Dec. 18, 2025), available *at* https://perma.cc/BT2H-SLQV.

15.    ED's confusing and contradictory notices provide little to no insight into the basis for the discontinuance.  Unless enjoined, Defendants' decision to discontinue these grants (the Non-Continuation Decision) will destroy projects years in the making.

16.    The Non-Continuation Decision is unlawful under the Administrative Procedure Act (APA), governing statutes and regulations, and the Constitution.

17.    The boilerplate notice implementing the Non-Continuation Decision violates the APA because it is arbitrary and capricious for several reasons.  The letter: (1) fails to provide any coherent, individualized reason for the determination; (2) fails to consider Plaintiffs' substantial

reliance interests; and (3) fails to consider the harmful impact to children and families dependent on Plaintiffs' FSCS projects.

18.    Additionally, Defendants' Non-Continuation Decision is contrary to law. Defendants cannot discontinue a multi-year grant based on new, secret priorities. *See* 34 C.F.R. § 75.253(b). The Department is required to publish the priorities for multi-year grants at the ***start*** of a grant competition and then use them to select awardees from a pool of competing applicants. *See* 34 C.F.R. §§ 75.100(a), 75.101(a)(4), 75.105; *Discretionary Grantmaking* at 14–15 (describing the use of priorities in grant competitions).

19.    Indeed, ED developed the FSCS grant priorities through a notice and comment process. Plaintiffs submitted their applications based on those priorities and were selected pursuant to them. Yet Defendants unlawfully ignored the priorities established for the grant selection process and sought instead to impose new, unpublished criteria.

20.    Moreover, Defendants failed to evaluate Plaintiffs' programs for continuation awards based on information relevant to "grantee performance"—such as fiscal data and performance measures—which is the only information "the Secretary may consider" "[i]n determining whether the grantee has met the requirements described in [34 C.F.R. § 75.235](a)." *Id.* § 75.253(b). Instead, Defendants concluded "that continuation of the project [was not] in the best interest of the Federal Government" solely because Plaintiffs' original grant proposals supposedly were not in alignment with the current administration's priorities. *See* 34 C.F.R. § 75.253(a)(5). But Defendants have never alleged, much less demonstrated, any performance issue that could serve as the basis for Plaintiffs' discontinuances. The ED letter does not even mention grantee performance. Defendants' Non-Continuation Decision based on new priorities unrelated to grantee performance accordingly violates 34 C.F.R. § 75.253(b).

5

21.     The Non-Continuation Decision also is contrary to law for purposes of the APA because it contravenes the General Education Provisions Act (GEPA).  For the Department's financial assistance programs, GEPA requires that the Department follow the notice and comment rulemaking process when setting the priorities for its competitive grants process.  20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).[1]  Defendants did not develop any "new priorities" through the required notice-and-comment process before unlawfully applying them to discontinue Plaintiffs' grants.

22.     Defendants' unlawful actions will cause immediate and irreparable harm to Plaintiffs.  Starting in January, public schools in Plaintiff States will be deprived of food distribution sites, emergency assistance, and other community supports that had enabled improvements in students' attendance and academic performance.

23.     Accordingly, Plaintiffs bring this action against the Department and Secretary McMahon seeking to hold unlawful, vacate, and set aside Defendants' Non-Continuation Decision; preliminarily and permanently enjoin Defendants from implementing or enforcing the Non-Continuation Decision; and declare that Defendants misapplied the Department's continuation regulation, 34 C.F.R. 75.253.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

25.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2), (e)(1). Defendants are an agency of the United States Government, and an officer sued in their official capacity.  Plaintiff State of Maryland is a resident of this judicial district, and a substantial part of

---

[1] The statute includes exceptions that do not apply here.

the events or omissions giving rise to this Complaint occurred and are continuing to occur within the District of Maryland.

## PARTIES

### I. Plaintiffs

26.    The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.  The University of Maryland, Baltimore, an instrumentality of the State of Maryland, is the recipient of ED Grant #S215J220024, which supports full-service community school projects at two Baltimore City public high schools, Renaissance Academy and Augusta Fells Savage Institute of Visual Arts.

27.    The District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.  District of Columbia Public Schools, an agency of the District of Columbia, is the recipient of ED Grants #S215J230148 and #S215J220100, which support full-service community school projects at DCPS elementary schools.

28.    The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.  ED Grant #S215J230049 supports the expansion of FSCS projects to 55 schools through the North Carolina Community Schools Coalition (NCCSC), a consortium that

encompasses 18 North Carolina school districts.  The North Carolina Department of Public Instruction, an executive agency of the State of North Carolina, serves on NCCSC's statewide steering committee.

## II. Defendants

29.    Defendant United States Department of Education is a cabinet agency created by Congress within the executive branch of the United States government. 20 U.S.C. § 3411.

30.    Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity. 20 U.S.C. § 3412.

## FACTUAL ALLEGATIONS

## I. ED Funding of FSCS Grant Programs

31.    Since at least 2008, ED has provided grant awards to support FSCS projects, inviting grant applications and making new awards based on funding availability.  Nine times in total, ED has invited applications and awarded grants for FSCS projects.  Specifically, FSCS grants were awarded for Fiscal Years 2008, 2010, 2014, 2015, 2018, 2019, 2020, 2022, and 2023.  *See* U.S. Dep't of Educ., *FSCS Grantees 2008–2023* (Dec. 6, 2023), https://www.ed.gov/sites/ed/files/2023/12/FSCS_Grantees_2008-2023_updated12.06.2023.xlsx.

32.    Starting from an initial 10 grants in 2008, ED has now awarded over 150 grants supporting FSCS projects across the country.

## II. The Department's Process for Awarding New Grants Is Separate and Apart from Its Process for Awarding Continuing Grants

33.    When the Department announces a competition for new grants for a particular fiscal year, it publishes an application notice in the Federal Register that explains, among other things:

a. How to apply for a new grant;

b. Whether the Secretary plans to approve multi-year projects and, if so, the project period that will be approved;

c. The priorities established for the selection of new grants for the program that year, including any competitive preference priorities for which an application could receive bonus points;

d. The selection criteria and factors that will be used to decide which applications will be awarded new grants and how the criteria will be weighted; and

e. Any program performance measure requirements, including whether the application should propose project-specific performance measures and how the proposed measures would accurately measure project performance.

*See* 34 C.F.R. §§ 75.100, 75.101, 75.105, 75.110, 75.201.

34.    The Department then scores the quality of each application using the selection criteria and competitive priorities, ranks the applications, and selects applications for new grants in order.  34 C.F.R. § 75.217; *Discretionary Grantmaking* at 26–27.  The selection criteria are given point values up to the total possible score that the Department announced for that year's grant competition.  *See* 34 C.F.R. § 75.201; *Discretionary Grantmaking* at 26-27.  Additional points may be earned if applicants meet competitive preference priorities.  34 C.F.R. 75.105(c); *Discretionary Grantmaking* at 27.

35.    After a grant is awarded, the Department holds an initial discussion with the grant awardee

to establish a mutual understanding of the specific outcomes that are expected, and to clarify measures and targets for assessing the project's progress and results.  Information on project outcomes is needed to ensure

that the project achieves the objectives stated in the application.  The post-award conference generally clarifies and lays the groundwork for reporting, monitoring, and ongoing communication between you and [the Department].  These activities are meant to ensure that the grant is administered in compliance with applicable statutes and regulations and that the project's goals are achieved.

*Discretionary Grantmaking* at 30.

36.     The selection procedures for the Department's decision of whether to continue multi-year grants is quite different from its process for awarding new grants, primarily because it is not a competitive process.  *See Discretionary Grantmaking* at 31–32, 45.

37.     *First*, when awarding multi-year projects, the Department funds the initial budget period (usually 12 months) and "indicates [its] intention to make continuation awards to fund the remainder of the project period."  34 C.F.R. § 75.251 (2024).

38.     *Second*, multi-year projects up for continuation do not go through an application process in which priority weights are assigned to competing applicants.  *Compare Discretionary Grantmaking* 26-27 *with* 31–32, 45.  Rather than revisiting the original application, the Department looks to information relevant to the grantee's performance for the previous year, including performance reports, performance measures, and financial data.  *See* 34 C.F.R. §§ 75.118 & 75.253(b); *Discretionary Grantmaking* at 32 ("The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions."); 59 Fed. Reg. at 30,259 ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application.").

39.     *Third*, instead of competing for funds, multiyear projects are given priority over new grants.  34 C.F.R. § 75.253(c); *Discretionary Grantmaking* at 45 ("A grantee does not have to compete with other applicants to receive [a continuation award]."); 45 Fed. Reg. 22,559 (Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis of the criteria in [34 C.F.R. § 253(a)] and will not be subject to competition with other applications") (emphasis added).

40.     Consistent with this process, the Department has long represented that a total cut-off in continuation award funding is "extremely rare in practice."  59 Fed. Reg. at 30,259.  More recently, the Department explained that "[i]n general, [ED] do[es] not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award."  89 Fed. Reg. at 70,316.

### III.  The Department's Review and Selection of FSCS Applicants Based on Published Priorities

41.     In 2022, ED engaged in statutorily required rulemaking to set new priorities for future FSCS grant applications.  *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).  It published the proposed priorities, requirements, and definitions that would be used to evaluate, score, and award grants to FSCS applications.  ED invited the public to comment on its proposals.  87 Fed. Reg. 1709 (Jan. 12, 2022).

42.     ED then published a notice announcing the "final priorities, requirements, and definitions, and selection criteria" for future FSCS grant competitions, and responding to the public comments received.  87 Fed. Reg. 41,675 (July 13, 2022).  The notice explained that in addition

11

to the criteria announced therein, ED would use certain specified criteria from existing regulations, 34 C.F.R. 75.210.[2]  87 Fed. Reg. at 41,684.

43.    ED then published notices inviting applications for FSCS grants.  87 Fed. Reg. 41,688 (July 13, 2022); 88 Fed. Reg. 37,222 (June 7, 2023).  The notices explained that the Secretary would consider specific criteria based on the priorities determined by the agency's rulemaking referenced above, as well as general criteria selected from those in 34 C.F.R. 75.210. 87 Fed. Reg. at 41,698; 88 Fed. Reg. at 37,234.

44.    The notices set out five "absolute priorities," as previously established in the agency's notice and comment process.  87 Fed. Reg. at 41,689; 88 Fed. Reg. at 37,224.  All FSCS program applicants were required to satisfy either Absolute Priority 1 or 2, which mandated that eligible programs serve at least two schools, and set forth the types of schools eligible under each priority.  In addition to satisfying one of these priorities, applicants were required to satisfy one additional absolute priority from the following: (3) capacity building and development grants, (4) multi-local educational agency grants, and/or (5) FSCS scaling grants.[3]  87 Fed. Reg. at 41,689– 90; 88 Fed. Reg. at 37,224.

45.    ED's notice also set out two "competitive preference priorities" that applicants could optionally address to earn up to five additional points each on their application.  87 Fed. Reg. at 41,690; 88 Fed. Reg. at 37,224–25.

---

[2]  ED added one more priority through the notice-and-comment process in 2023.  88 Fed. Reg. 37,218 (June 7, 2023).  The additional priority required applicants to "participat[e] in a national evaluation of effectiveness of the FSCS program using a randomized controlled trial design that requires applicants to propose at least two, rather than four, schools to potentially receive grant funding."  *Id.* at 37,219.

[3]  For 2023, ED also required that grantees "participate in a national evaluation assessing the implementation of the FSCS program."  88 Fed. Reg. 37,228 (June 7, 2023).

12

46.     The notice then synthesized all selected priorities into a specific list of criteria to be considered for each application and assigned a point value for each criterion.  87 Fed. Reg. at 41,698–99; 88 Fed. Reg. at 37,234–36.

47.     Based on the Secretary's assessment of all specified criteria, including the competitive preference priorities, each application could receive a score of up to 110 total points. 87 Fed. Reg. at 41,698; 88 Fed. Reg. at 37,234.

**IV.  Plaintiffs Applied for and Were Awarded FSCS Grants**

48.     Plaintiffs applied for FSCS grants.  By way of example, a true and correct copy of UMB's application is attached as Exhibit 2.

49.     Plaintiffs tailored their project proposals to the priorities announced by the Department for FSCS grants.  UMB's application, for example, specified that it would address Absolute Priorities 1 and 3 that were identified in the notice inviting applications, along with both competitive preference priorities.  Ex. 2 at 180.

50.     UMB's application proposed to implement FSCS projects at two Baltimore City public high schools: Renaissance Academy and Augusta Fells Savage Institute of Visual Arts.  *See id.* at 15.  The primary objectives were to (1) "increase student academic achievement," including "attendance, behaviors, and graduation rates through academic support programs and out-of-school activities," (2) better assess "areas for improvement," and (3) "help families become more positively engaged in their children's education."  *Id.* at 15.

51.     Plaintiffs' applications were successful.  By way of example, on December 22, 2022, ED informed UMB that its application was accepted for funding under the FSCS program.  A true and correct copy of ED's letter notifying UMB of its grant award is attached as Exhibit 3.

13

52.    Under its FSCS grant, UMB would receive $385,507 in its first year (2023), and—if funding were continued—thereafter would receive a similar amount each year through the end of 2027.

53.    Plaintiffs' grants were renewed consistently for subsequent years.  By way of example, on November 20, 2023, ED continued funding for UMB's program in the amount of $381,486 for 2024.  A true and correct copy of ED's Grant Award Notification for the 2024 budget year is attached as Exhibit 4.

54.    On December 20, 2024, ED continued funding for UMB's program in the amount of $385,555 for 2025.  A true and correct copy of ED's Grant Award Notification for the 2025 budget year is attached as Exhibit 5.

55.    The FSCS projects have led to critical successes at schools in Plaintiff States.  By way of example, as described in UMB's letter requesting reconsideration of the Non-Continuation Decision—a true and correct copy of which is attached as Exhibit 6—attendance has increased significantly at both schools served by UMB's project, likely due to the familial and social supports provided by UMB. Ex. 6 at 15, 17.  Hundreds of students across both schools have received food distribution and community support, including emergency assistance such as housing stability and utility fee assistance.  *Id.*  Moreover, students have participated in dozens of college and career exposure opportunities, such as college tours and presentations from trade programs.  *Id.*

56.    NCCSC's project is expanding to serve approximately 23,000 students from low-income families, most of whom attend schools in rural parts of North Carolina.  The project provides integrated student support, expanded and enriched learning opportunities, and family and community engagement services.  In 2024, several schools participating in NCCSC helped their communities weather the impacts of Hurricane Helene.

14

### V.  The Department Non-Continued Plaintiffs' Grants

57.     On December 12, 2025, without any warning, ED sent a "Notice of Non-Continuation of Grant Award" to many FSCS grantees, informing them that their grants would not be continued after the end of the current budget period on December 31, 2025 (just over two weeks later). *See, e.g.*, Ex. 1.

58.     Although the notices are perfunctory and self-contradictory, they purport to justify the non-continuations by saying that the projects "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." *E.g., id.* at 1.

59.     In a boilerplate statement, each notice claims that "[t]he Department has undertaken a review of grants" and identified several alternative grounds supposedly support non-continuation:  "[T]he programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." *E.g., id.*

60.     Upon information and belief, the Department's "review of grants" was prompted by a February 5, 2025 Directive on Department Grant Priorities entitled "Eliminating Discrimination and Fraud in Department Grant Awards."  A true and exact copy of the Directive on Department Grant Priorities is attached as Exhibit 7.

61.     The Directive on Department Grant Priorities states in pertinent part:

> Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants arc free from fraud, abuse, and duplication.

Ex. 7 at 1.

62.    Unlike the FSCS priorities, the Directive on Department Grant Priorities was not issued through notice and comment rulemaking.  *Cf.* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

63.    The FSCS notices conclude that, based on some of the specified reasons, "[t]he grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued."  *E.g.*, Ex. 1 at 1.

64.    Yet the following paragraph of each letter makes clear that the Department's "review" consisted entirely of searching for disfavored words and phrases in grantees' applications, rather than evaluating "grantee performance" as required by the regulations.  *See* 34 C.F.R. § 75.253(b).

65.    By way of example, in UMB's Notice of Non-Continuation, ED claimed that it had "identified that the applicant has proposed project activities that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."  Ex. 1 at 1.  To support that claim, ED quoted two fleeting references to "anti-racism" in UMB's FSCS grant application and concluded that "[a]s a result of the information identified above, the Department has determined that the project would be in conflict with agency policy and priorities, and so is not in the best interest of the Federal Government."  *Id.*

66.    The sentences in question describe services provided by Family Connections Baltimore (FCB), the clinical arm of UMB's Center for Restorative Change, whose mental health clinicians and staff partner with families to provide therapeutic support, financial assistance, and connections to critical resources.  The 117-page program narrative in UMB's FSCS application mentioned in passing that "FCB services are grounded in anti-racism/anti-oppression, supporting the basic needs of children, preventing child maltreatment, and serving families whose children

16

are at increased risk of placement in state funded care," *see* Ex. 2 at 96, and that "FCB offers case management, therapeutic support, financial assistance, and resource linkages.  The team consists of Licensed Mental Health Clinicians and graduate level social work interns who provide services through an anti-racist and trauma responsive lens."  *Id.* at 45.

67.    UMB's notice fails to explain how FCB's efforts to "support[] the basic needs of children, prevent[] child maltreatment," and offer[] case management, therapeutic support, financial assistance, and resource linkages," conflict in any way with "prioritizing merit, fairness, and excellence in education."  *See* Ex. 1 at 1.  Nor does the notice examine—or even mention— "any relevant information regarding grantee performance," the only information that "the Secretary may consider" under 34 C.F.R. § 75.253(b).

68.    The notice stated that UMB could request reconsideration of the decision within seven calendar days.  *Id.* at 1.  UMB submitted a request for reconsideration on December 19, 2025.  *See* Ex. 6 (reconsideration request).

69.    In the request, UMB urged ED to reverse its decision, explaining that ED made a "plain error" in misconstruing two sentences in UMB's original, exhaustive program application.  *Id*. at 2.  Although UMB offered to revise the project plan to "remove all references to 'anti-racism,' 'anti-oppression,' or similar terminology," UMB made clear that any such changes would not "alter the core, scope, or intent" of the FSCS project, which already "serves all students and families without regard to race, gender, or background," and already is "implemented in a manner consistent with equal treatment, equal opportunity, and federal education policy."  *Id*. at 7.

70.    Despite having only five business days to request reconsideration, UMB also submitted letters in support from the Maryland State Department of Education, Baltimore City

17

Public Schools, Augusta Fells Savage Institute of Visual Arts, and Renaissance Academy High School. *Id*. at 9–17. Each of these stakeholders urged ED to reconsider and reverse its decision discontinuing grant funding.

71.     To date, UMB has not received a response. UMB's project will be effectively discontinued as of December 31, 2025.

72.     NCCSC already received a denial of its request for reconsideration dated December 29, 2025.

73.     Public reporting indicates that ED abruptly non-continued a total of 19 of 70 ongoing FSCS awards for similar reasons around the same time. *See* Lieberman, *supra*. These non-continuations will result in the loss of $168 million in federal funds to projects across 11 states and the District of Columbia.

## VI.   Impact of the Department's Non-Continuation Decision

74.     Defendants' Non-Continuation Decision will irreparably harm Plaintiffs and their FSCS projects.

75.     By way of example, for UMB, "[n]on-continuation of this grant would result in immediate harm––immediate loss of essential, evidence-based supports that remove both academic and non–academic barriers to success of Maryland students and student readiness for college or career." Ex. 6 at 5.

76.     Further "the discontinuation of these services will disproportionately impact students and families experiencing housing insecurity, food instability, and limited access to supplemental learning opportunities, undermining recent gains in school attendance, school conditions for optimal learning, and post–secondary readiness, and reversing progress that the federal investment was designed to achieve." *Id*.

18

77.    In a letter accompanying UMB's reconsideration request, Baltimore City Public Schools explained that the grant discontinuation would "disrupt established school-based infrastructure and undermine progress built over multiple years." *Id.* at 12.

78.    UMB's FSCS grant provides food to families through Hungry Harvest and snacks for students during the school day through Stanley Snacks.  It provides financial support to families facing housing instability, eviction, and utility cutoffs.  And it enables tutoring for students who are struggling academically.  If the grant comes to a premature end as a result of the Non-Continuation Decision, then those resources will also end.

79.    UMB's grant also supports salaries for University staff who work on the FSCS project.  Without that support, UMB expects that in the coming fiscal year it will be forced to lay off a staff member and either lay off or reduce salaries for up to six other staff members.

80.    School districts in Plaintiff States are both direct recipients of non-continued grants and benefit from partnerships with nonprofit grantees.  In many States, "[s]chool districts . . . are instrumentalities of the State," *e.g.*, *Milliken v. Bradley*, 418 U.S. 717, 727 n.5 (1974), so the Department's non-continuation of FSCS grants—both to school districts and their nonprofit partners—necessarily harms the State itself.  *See, e.g.*, *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 588, 590 (6th Cir. 2024) (noting injury to state university supports state's Article III standing); *Biden v. Nebraska*, 600 U.S. 477, 490–93 (2023) (holding injury to state instrumentality to constitute injury to state itself); *Bd. of Educ. v. Zimmer-Rubert*, 409 Md. 200, 206, 973 A.2d 233, 236 (2009) ("We have long considered county school boards to be State agencies rather than independent, local bodies."); *see also Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 655–56 (N.C. 1992); D.C. Code § 38-171 (DCPS is "a separate cabinet-level agency . . . within the executive branch of the District of Columbia government").

19

81.     Even where school districts are not considered State entities, harm to public school districts produces harm to the States.  Plaintiff States are constitutionally obligated to provide for public education, Md. Const. art. VIII, § 1; N.C. Const. art. IX, § 2, and that duty is impeded when after-school, tutoring, parental support, and other services for students are discontinued, requiring the State to fill the financial gap to prevent disruption to those services.  *See, e.g.*, *Md. Shall Issue v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) ("[F]inancial harm is a classic and paradigmatic form of injury in fact.") (quoting *Air Evac EMS v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018)); *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 639, 458 A.2d 758, 780 (1983) ("Maryland has continuously undertaken to provide a thorough and efficient public school education to its children in compliance with Article VIII of the Maryland Constitution."); *Leandro v. North Carolina*, 488 S.E.2d 249, 255 (N.C. 1997) (noting State's duty to provide for education); *see also Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the most important function of state and local governments.").

82.     In addition, Defendants communicated their Non-Continuation Decision less than three weeks before the relevant appropriations expire after December 31, 2025.  *See* Department of Education Appropriations Act, 2024, Further Consolidated Appropriations Act, 2024, div. D, tit. III, Pub. L. 118-47, 138 Stat. 684 (Mar. 23, 2024), *continued for 2025 by* Full-Year Continuing Appropriations Act, 2025, div. A, Pub. L. 119-4, § 1101(8), 139 Stat. 11 (Mar. 15, 2025).

83.     By communicating the Non-Continuation Decision so close to the appropriations' lapse date, Defendants have created an unacceptable risk that the appropriations will expire before they can be spent—contrary to Congress's intent—and have unfairly burdened Plaintiffs' rights to seek reconsideration and challenge the Non-Continuation Decision in court.

84.     Defendants also did not provide Plaintiffs with a reasonable "opportunity to object and provide information challenging the action."  2 C.F.R. § 200.342; *see* 34 C.F.R. § 75.253(g). Not only did Defendants allow Plaintiffs only five business days to request reconsideration, they also left themselves less than two weeks before the lapse date to act on those requests, making it essentially impossible for Defendants to provide a considered response.

85.     Plaintiffs have filed suit by December 31, 2025 to preserve this Court's jurisdiction over the appropriated funds.  Plaintiffs invoke 31 U.S.C. § 1501(a)(6), (9) and 31 U.S.C. § 1502(b), as well as this Court's equitable powers, in support of this Court's authority to vacate the Non-Continuation Decision and require Defendants to make new continuation award decisions for the next budget period even after the appropriations would otherwise expire.  *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 98 (D.C. Cir. 2021) (quoting *City of Houston v. U.S. Dep't of Hous. & Urb. Dev't*, 24 F.3d 1421, 1426 (D.C. Cir. 1994)).

## VII.   Defendants' Similar Non-Continuation of Other Grants

86.     Defendants' conduct here parallels their earlier non-continuation of Mental Health Service Professional Demonstration Grants and School-Based Mental Health Services Grants (the Mental Health Grants), which several Plaintiffs in this case challenged in *Washington v. U.S. Department of Education*, No. 2:25-cv-01228 (W.D. Wash. June 30, 2025).

87.     In April 2025, Defendants decided to non-continue the Mental Health Grants "based on an alleged conflict with the current Administration's priorities."   Compl., *Washington v. U.S. Dep't of Educ.*, No. 2:25-cv-01228, ECF 1, ¶ 6 (W.D. Wash. June 30, 2025).  There, as here, Defendants "sen[t] boilerplate notices to Plaintiffs claiming that their grants conflicted with the Trump Administration's priorities and would not be continued."  *Id.*

88.     The Mental Health Grant Plaintiffs filed suit in the U.S. District Court for the Western District of Washington, alleging, among other things, that Defendants' non-continuation was arbitrary and capricious and contrary to law under the APA and violated the U.S. Constitution.

89.     The District Court agreed, first granting the Mental Health Grant Plaintiffs' Motion for Preliminary Injunction, Order, *Washington v. U.S. Dep't of Educ.*, No. 2:25-cv-01228, ECF 193 (W.D. Wash. Oct. 27, 2025), and later granting those Plaintiffs' Motion for Summary Judgment, Order, *Washington v. U.S. Dep't of Educ.*, No. 2:25-cv-01228, ECF 269 (W.D. Wash. Dec. 19, 2025).  The District Court concluded that "the Department's actions [were] arbitrary and capricious and contrary to law."  Order, *Washington v. U.S. Dep't of Educ.*, No. 2:25-cv-01228, ECF 269, at 2 (W.D. Wash. Dec. 19, 2025).

90.     Defendants unsuccessfully sought a stay of the District Court's preliminary injunction pending appeal.  The U.S. Court of Appeals for the Ninth Circuit held that "[t]he Government ha[d] not made a strong showing it [was] likely to succeed on the merits of its claims that the district court lack[ed] jurisdiction" under the Tucker Act, 28 U.S.C. § 1491; had not "made a strong showing . . . that the discontinuation decisions are committed to agency discretion and are therefore unreviewable under the APA," and "ha[d] not demonstrated it w[ould] be irreparably injured absent a stay."  *Washington v. U.S. Dep't of Educ.*, No. 25-7157 2025 WL 3486895, at *1–3 (9th Cir. Dec. 4, 2025) (per curiam).

91.     As in the Mental Health Grants case, Plaintiffs' APA challenge to the Non-Continuation Decision falls within the jurisdiction of the district courts.

## CLAIMS FOR RELIEF

**COUNT I**
**Administrative Procedure Act**
**Arbitrary and Capricious**

92.     Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

93.     The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

94.     The Department is an "agency" under the APA, 5 U.S.C. § 551(1), and the Defendants' Non-Continuation Decision is an agency action subject to review under the APA.

95.     An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified).

96.     An agency action is also arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id*.

97.     The Non-Continuation Decision is arbitrary and capricious because the Department did not examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019).  Notices repeating boilerplate language and cherry-picking a few phrases out of a massive grant proposal fail to articulate a satisfactory explanation that meets this standard.

23

98.    The Non-Continuation Decision is arbitrary and capricious because the Department's boilerplate, disjunctive criticisms of the grant applications force Plaintiffs and a reviewing court to guess as to the real basis for Defendant's decision to non-continue. *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (faulting boilerplate language for making it impossible to discern agency's rationale); *see SEC v. Chenery Corp.*, 332 U.S. 194, 196–197 (1947) (holding agency action is arbitrary and capricious where party is "compelled to guess at the theory underlying the agency's action").

99.    The Non-Continuation Decision is arbitrary and capricious because Defendants violated the "change-in-position doctrine," which prevents agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Inv'ts*, 604 U.S. 542, 567–68 (2025). "Under that doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* at 568 (quoting *Encino Motorcarsv. Navarro*, 579 U.S. 211, 221–22 (2016)). Defendants' notices obliquely reference the Department's change in policy preferences without identifying or explaining this changed position, or how the administration's new preferences allegedly conflicted with those of the prior administration.

100.    The Non-Continuation Decision also violates the change-in-position doctrine because Defendants failed to account for the serious reliance interests of grantees in Plaintiff States in making this change in policy.    These grantees have structured their budgets with the understanding that Defendants would make annual continuation awards based on grantees' project performance, consistent with the Department's governing priorities at the time of the application, under the FSCS program through the remainder of the project performance period. *Discretionary Grantmaking* at 31–32.    Grantees have also structured their budgets in the expectation that,

24

consistent with their project proposals, they would have several years to generate performance results and identify and build relationships with new sources of funding that would allow grantees to continue their projects following the end of the federally funded performance period. Grantees' reliance is based on, among other things, Defendants' history and practice under the FSCS program, and Defendants' regulations showing Defendants' "intention to make continuation awards to fund the remainder of the project period" upon approval of multi-year grants, 34 C.F.R. § 75.251(b)(2) (2013), and prioritization of "continuation awards over new grants," 34 C.F.R. § 75.253(c) (2024). *See also, e.g.*, 59 Fed. Reg. at 30,259 (explaining that a cut-off in continuation award funding is "extremely rare in practice"); 89 Fed. Reg. at 70,316 (explaining that, "[i]n general, we do not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance"). Believing that discontinuances would be based on criteria within their control—i.e. their performance—grantees invested time and resources that will now be lost because of these discontinuances based on improper criteria outside their control. 34 C.F.R. § 75.253(b) (2024).

101. The Department also failed to account for the reliance interests of the program participants: Plaintiff States, the program administrators who have invested time and effort in these programs, the schools directly served, and the students and families who rely on these programs for a wide range of support.

102. Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

103. Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating

Defendants' Non-Continuation Decision and enjoining Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision.

## COUNT II
### Administrative Procedure Act
### Contrary to Law

104.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

105.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law; or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

106.    Defendants' Non-Continuation Decision is contrary to law because it violates Defendants' regulations addressing continuation funding for multi-year grant awards.

107.    Specifically, when determining whether a grantee has met the requirements to receive a continuation award, Defendants are limited to consideration of "any relevant information regarding grantee performance."  34 C.F.R. § 75.253(b) (2024); *see also, e.g.*, *Discretionary Grantmaking* at 32 (explaining that performance information is used "to determine" whether § 75.253(a) requirements, including the requirement that "continuation of the project is in the best interest of the Federal government," are met).  Defendants have exceeded their regulatory authority by considering information not relevant to grantee performance, including unlawfully applying new priorities that purportedly displace the original priorities under which Plaintiffs' grant applications were selected and under which Plaintiffs' performance is being measured.  *See, e.g*., 34 C.F.R. § 75.118; 59 Fed. Reg. at 30,258 (explaining that "[t]he performance report . . . will provide the information on which the funding decision will be made").

108.    Defendants may set program priorities for any given grant program only at the outset of the program, when Defendants publish the application notice for new grants.  Defendants cannot change the priorities for a grant after a multi-year grant has been awarded. *See, e.g.*, 34 C.F.R. § 75.100(a) ("Each fiscal year, the Secretary publishes application notices . . . *for new grants*[.]") (emphasis added); *id.* § 75.101(a)(4) (application notice includes "[a]ny priorities established by the Secretary for the program for that year"); *id.* § 75.105 (describing process for establishing "priorities for selection of applications in a particular fiscal year").  In contrast, continuation awards do not go through an application process. *See id.* § 75.118; 59 Fed. Reg. at 30,259 ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application.").

109.    Further, Defendants actions have violated the priority 34 C.F.R. § 75.253(c) assigns to continuation awards over new grants.  34 C.F.R. § 75.253(c); *see, e.g.*, 45 Fed. Reg. 22,494, 22,559 (Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis of the criteria in [§ 253(a)] and *will not be subject to competition with other applications*") (emphasis added).

110.    Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

111.    Pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Non-Continuation Decision and enjoining Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision.

## COUNT III

27

**Administrative Procedure Act**
**Notice and Comment**

112.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

113.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

114.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "Failure to abide by these requirements renders a rule procedurally invalid." *Id.*

115.    Under GEPA, Defendants are required to follow the APA's notice-and-comment rulemaking procedure when changing the requirements for grant competitions. *See* 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d).

116.    Consistent with their statutory obligations, Defendants underwent the notice-and-comment rulemaking process when they changed the FSCS priorities in 2022. *See* 87 Fed. Reg. 1709 (Jan. 12, 2022) (proposed priorities); 87 Fed. Reg. 41,675 (July 13, 2022) (final priorities).

117.    When ED published a notice inviting applications for FSCS grants, it explained that the Secretary would consider specific criteria based on the priorities determined by the agency's rulemaking. 87 Fed. Reg. 41,668 (July 13, 2022).

118.    Plaintiffs were awarded FSCS grants pursuant to those priorities.

28

119.    Although Defendants did not change the existing FSCS priorities through the notice-and-comment process, they nevertheless non-continued Plaintiffs' grants based on a purported "conflict with" the "priorities and policy preferences . . . of the current Administration." *See, e.g.*, Ex. 1 at 1.

120.    Defendants cannot change grant priorities without proceeding through notice and comment, 20 U.S.C. §§ 1221e-4, 1232(a)(2), (d), and cannot discontinue Plaintiffs' multi-year grants based on changed priorities in the middle of their term.

121.    The Non-Continuation Decision and Defendants' actions in implementing it are procedurally invalid under the APA.

122.    Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

123.    Pursuant to 5 U.S.C. §§ 705, 706, and 28 U.S.C. § 2201, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and vacating the Non-Continuation Decision and enjoining Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision.

### COUNT IV
### U.S. Constitution
### Spending Clause

124.    Plaintiffs reallege and incorporate by reference the allegations contained in each of the preceding paragraphs as if fully set forth herein.

125.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015).

29

126.    The Spending Clause of the U.S. Constitution, Article I, Section 8, Clause 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

127.    The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18, 25 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012). Agencies must set out funding conditions "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 & n.6 (9th Cir. 2019) (applying Spending Clause constraints to "middleman agencies" charged with administering funds). This requirement flows from the Spending Clause principle that States must "voluntarily and knowingly" accept conditions attached to federal spending. *Id.* at 296 (quoting *Pennhurst*, 451 U.S. at 17). States "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). The requirement of unambiguous conditions "enable[s] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.

128.    Defendants' Non-Continuation Decision altered the conditions upon which grants were obligated and funds disbursed, contrary to the Spending Clause. To give grantees sufficient notice of the applicable conditions for these awards, the Department published priorities, requirements, and definitions in the Federal Register. *See, e.g.*, 87 Fed. Reg. 47,164 (Aug. 2, 2022); 87 Fed. Reg. 47,165 (Aug. 2, 2022). Grantees in Plaintiff States designed their projects to meet the priorities announced in the year they applied. Grantees accepted their grant awards with the understanding that they would be held to, and evaluated against, the projects they

30

proposed in their grant applications, and that the Department would prioritize continuation awards over new grant awards. 34 C.F.R. § 75.253(c). The new priorities that were announced for the first time in the discontinuance notices and supposedly supported the Non-Continuation Decision put these grantees at a disadvantage. New applicants are working from a blank slate and can tailor their projects to fit the Department's new priorities. Existing grantees, however, have already invested substantial time and resources into designing and implementing multiyear projects and will now have to rework them in light of the new priorities, even though they should not be required to compete with new grantees. *Id.* §§ 75.105 & 75.253(c). These new priorities are retroactive conditions which the Department has unfairly and summarily determined grantees in Plaintiff States cannot meet.

129. Defendants' Non-Continuation Decision further amounts to a new and retroactive condition on program funding, as Defendants now assert authority to unilaterally discontinue a federal grant on grounds not authorized by Congress through the program grant authorizing statutes or GEPA, and are not consistent with 34 C.F.R. § 75.253. These alterations are retroactive, ambiguous, and inconsistent with the purpose of the programs, GEPA's requirement that grant recipients address "equity," *see* 20 U.S.C. § 1228a(b), and the final rulemaking priorities governing the programs issued pursuant to GEPA and 34 C.F.R. § 75.105(b).

130. Defendants' Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

131. For the foregoing reasons, Plaintiffs are entitled to a preliminary and permanent injunction barring Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision, and to a declaration pursuant to 28 U.S.C. § 2201 declaring unconstitutional, the Non-Continuation Decision and any action taken to enforce or implement it.

31

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

i.   Issue preliminary and permanent injunctive relief barring implementation of the Non-Continuation Decision as to projects serving Plaintiff States, their subdivisions, and their instrumentalities; and ordering equitable relief, requiring the Department to make a new continuation award decision for the next budget period without considering performance issues—if any—caused by the Department's Non-Continuation Decision and its disruptive effects;

ii.  Enter an order pursuant to 5 U.S.C. § 706(2) holding unlawful and vacating the Defendants' Non-Continuation Decision and actions to effectuate it;

iii. Enter declaratory and injunctive relief specifying that in any determination under 34 C.F.R. § 75.253(b), Defendants may only consider information relevant to a grantee's performance when determining whether the grantee has met the requirements of 34 C.F.R. § 75.253(a), and this determination excludes consideration of new Department priorities not in effect when the grant was originally awarded;

iv.  Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v.   Award such other relief as this Court may deem proper.

Date:   December 30, 2025

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (D. Md. Bar No. 31543)
Michael Drezner (D. Md. Bar No. 31784)
    *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.maryland.gov

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
    COLUMBIA

By: */s/ Mitchell P. Reich*
Mitchell P. Reich*
    *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
    of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the State of Maryland*

*Counsel for the District of Columbia*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
Daniel P. Mosteller*
  *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

*\* Motion for admission pro hac vice forthcoming*

33